UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMOTHY WAYNE SHEPHERD, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:17-CV-3610 |
| | § | |
| LORIE  DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Petitioner Timothy Wayne Shepherd was convicted of murder by a jury in the 183rd

District Court of Harris County, Texas.  That court sentenced him to 99 years imprisonment.

Shepherd filed an amended petition for a writ of habeas corpus challenging his

conviction.  Respondent moved for summary judgment, and Shepherd responded to the motion.

Having carefully considered the amended petition, the motion, the response, all the arguments

and authorities submitted by the parties, and the entire record, the Court is of the opinion that

respondent's motion should be granted, and Shepherd's amended petition should be dismissed.

## I.     Background

The Texas Court of Appeals summarized the relevant facts**.**

> While 16 years old, the complainant, Tynesha Stewart, met and
> began dating [Shepherd], then 24 years old. The relationship grew
> more serious and Stewart eventually rented an apartment in which
> they both lived. In 2006, Stewart was accepted into Texas A & M
> University and she started her freshman year that August.
>
> During Stewart's first semester at Texas A & M, [Shepherd] called
> Stewart's dorm or cellular telephone several times daily. Many of
> Stewart's telephone conversations with [Shepherd] were
> unpleasant. When Stewart returned home following the end of her
> first semester, witnesses reported that she appeared more social
> and started talking to a student at another college named Mark. For
> a brief time, [Shepherd]'s telephone calls ceased. However, by

February 2007, [Shepherd] began calling Stewart again. As Stewart's spring break approached, she expressed concern about going home to Houston. Stewart stated she feared [Shepherd] would follow her around.

Despite her concern over [Shepherd]'s behavior, Stewart returned to Houston for her spring break. Once back in Houston, Stewart made plans with friends to attend a concert at the Houston Livestock Show and Rodeo on Thursday, March 15, 2007. In addition, Stewart made plans to travel to Padre Island for the last part of her spring break.

On March 14, Stewart visited with Mark and other friends and then went to the apartment of her friend Lois Greenwood. [Shepherd] picked Stewart up from that apartment early on the morning of March 15. Stewart left without her cellular telephone and told Greenwood she would return later that day. Stewart never returned to Greenwood's apartment. Stewart did not show up for the concert. . . Greenwood eventually contacted Stewart's family. It was later determined that Stewart's younger sister was the last to speak with Stewart at about noon on March 15; at that time, she learned Stewart was with [Shepherd].

James Hebert was [Shepherd]'s neighbor. Hebert testified during [Shepherd]'s trial that he saw Stewart for the last time on March 15, when she was walking up the stairs to [Shepherd]'s apartment. Hebert told the jury that he and [Shepherd] frequently barbecued together and he had loaned [Shepherd] his barbecue grill. Hebert also testified that within a day or so after he last saw Stewart, [Shepherd] began barbecuing on his patio. According to Hebert, [Shepherd] was barbecuing day and night, which was unusual for [Shepherd]. When Hebert inquired if [Shepherd] would give him some of the barbecue, [Shepherd] refused, saying the barbecue was for a wedding. Herbert testified this was unusual as [Shepherd] normally shared his barbecue. Hebert also testified that eventually the fire in [Shepherd]'s barbecue grill, which was on [Shepherd]'s second floor apartment patio, got out of control and Hebert's girlfriend called the fire department. Herbert further testified that he watched as the police and firefighters arrived and that [Shepherd] did not look as though he wanted them inside his apartment, but he eventually allowed them in.

Robert Logan, a Ponderosa Fire Department volunteer firefighter, and Deputy Russell of the Harris County Sheriff's Department, both testified at trial about responding to the fire on [Shepherd]'s patio. Logan testified that [Shepherd] was initially reluctant to let

them in the apartment. He also testified that once he got inside the apartment, he did not find a fire. Both Logan and Russell testified regarding meat they observed in [Shepherd]'s apartment. They found meat in [Shepherd]'s bathtub. According to Logan, there were some rib bones and two other small pieces of meat about the size of his hand floating in clear water in the tub. Russell testified he saw a rack of ribs and two small chickens floating in the tub. In addition to the meat floating in the tub, Russell testified he saw three small burned chickens sitting on the stove in [Shepherd]'s kitchen. According to Russell, one of the chickens was still smoking. Russell testified he did not see anything in the apartment that he considered unusual as he had "seen people do that before in the areas that [he has] worked."

The following Monday, March 19, Harris County Sheriff's Deputy Wallace Wyatt, Stewart's mother, Gayle Shields, and Greenwood went to [Shepherd]'s apartment. After [Shepherd] answered the door, Deputy Wyatt questioned [Shepherd] regarding Stewart's whereabouts. [Shepherd] told Deputy Wyatt that she had been there last Thursday, but they argued over her having a new boyfriend and that she had left the apartment, walking. Deputy Wyatt then asked [Shepherd] if he could look around the apartment. [Shepherd] consented. Deputy Wyatt testified that the apartment was dirty and he noticed an area with new, white paint, but otherwise nothing stood out as indicating any criminal activity.

Soon after this initial contact with [Shepherd], a search began for Stewart. A headquarters for the search was set up at Abiding Word Church. On March 20, 2007, Sergeant Yvonne Cooper of the Harris County Sheriffs Department, was dispatched to the church, arriving about 6:10 p.m. Upon arriving, she learned [Shepherd] was on his way to the church. Sergeant Cooper wanted to interview [Shepherd] because he was the last person to see Stewart. When [Shepherd] arrived, Sergeant Cooper placed him in her patrol car for his own protection from the gathering crowd. Sergeant Cooper asked [Shepherd] if he was willing to provide a written statement and he agreed to do so. However, when asked if he would consent to a search of his apartment and vehicle, [Shepherd] refused. Before [Shepherd] was driven to the Harris County Sheriffs Department Homicide Division offices, Sergeant Cooper obtained the keys to [Shepherd]'s apartment and car.

[Shepherd] arrived at the Homicide Division about 8:30 p.m., where he was interviewed by Sergeant Craig Clopton. Once he spoke with Sergeant Clopton, [Shepherd] consented to a search of

his apartment and car. Sergeant Clopton then notified Sergeant Cooper and she, along with two other detectives, searched [Shepherd]'s apartment. During the search, the detectives looked for any evidence suggesting that foul play had occurred in the apartment. They noted freshly painted areas in the apartment, which is an indicator that evidence may have been covered up. The detectives also conducted presumptive blood tests which returned positive results behind the bathroom light switch, the base of the toilet, and the western edge of the tub.

On March 21, Quanell X Farrakhan ("Quanell X"), the leader of The New Black Panthers and The New Black Muslim Movement got involved in the search for Stewart. While meeting with Stewart's family, Quanell X received a telephone call from [Shepherd] and he agreed to meet with [Shepherd]. Quanell X met [Shepherd] at a nearby motel and instructed [Shepherd] to get into his car. They then travelled to [Shepherd]'s apartment. Concerned the police might have planted listening devices, Quanell X and [Shepherd] went into the apartment bathroom. Inside the bathroom, [Shepherd] became visibly more nervous. Quanell X asked [Shepherd], "... are you sure you do not know what happened to this sister?" At that point [Shepherd] said he did not want to talk in the bathroom and asked if they could leave the apartment and talk outside.

Quanell X and [Shepherd] left the apartment and walked toward the apartment complex's tennis courts. As they walked, [Shepherd] stated: "[m]an they going to kill me. They going to give me the death penalty." To ease his concerns about the death penalty, Quanell X suggested [Shepherd] speak to his attorney, Stanley Schneider. After a telephone conversation with Schneider, [Shepherd] appeared more comfortable and agreed to take Quanell X to where he had placed Stewart.

At that point, Quanell X contacted the Sheriff's Department and they dispatched Sergeant Miller to accompany [Shepherd] and Quanell X. When Sergeant Miller arrived and got into Quanell X's car, [Shepherd] directed them to another apartment complex. Once inside that complex, they travelled to the back toward a trash dumpster. The three men exited the car and walked up to the dumpster where Quanell X asked [Shepherd]: "Tim, is this where you put her?" [Shepherd] answered "[y]es." Sergeant Miller then placed [Shepherd] under arrest.

[Shepherd] was taken to the Harris County Homicide Division where he was placed in an interview room. Once [Shepherd] was

in the interview room, Sergeant Miller took photographs to document any injuries [Shepherd] may have had when he was brought into custody. At that point in time, [Shepherd] pointed out a small cut on one of his fingers, which Sergeant Miller photographed.

After being photographed, [Shepherd] informed Sergeant Miller that he wanted to speak to his attorney, Stan Schneider. When Schneider arrived outside the Homicide Division offices, Assistant District Attorney Kelly Siegler informed Schneider that he could not consult with [Shepherd] or represent [Shepherd] because there was a conflict of interest since Schneider represented Quanell X. Despite that comment by Siegler, Schneider was allowed to briefly meet with [Shepherd]. After that meeting, [Shepherd] agreed to give his statement to the detectives. During that statement, [Shepherd] confessed to killing Stewart.

Following [Shepherd]'s confession, the detectives obtained a search warrant and searched [Shepherd]'s apartment again. During this search, the detectives seized, among other items, the drain traps and the garbage disposal.

During the guilt-innocence phase of [Shepherd]'s trial, DNA analyst Nikki Redmond testified . . . that she tested blood found on a pair of jeans seized from [Shepherd]'s apartment. Redmond testified that the blood revealed a DNA profile consistent with [Shepherd] and that Stewart could not be excluded as a possible minor contributor to the mixture. Redmond also testified regarding several pieces of bone and enamel that had been located inside the garbage disposal. DNA testing revealed that Stewart could not be excluded as a possible contributor and [Shepherd] could be excluded as a possible contributor to the DNA obtained in relation to State's exhibit 167–A, one of the items found in [Shepherd]'s garbage disposal.

The State also called forensic anthropologist Dr. Jennifer Love to testify as an expert regarding bone trauma and toolmarks found on bone fragments collected below [Shepherd]'s apartment patio. Dr. Love testified that she is employed by the Harris County Medical Examiner's Office. Dr. Love testified regarding her qualifications, which included master's and doctoral degrees in physical anthropology. While studying for those degrees, Dr. Love also received training in toolmark analysis. Dr. Love also testified that she had worked as a forensic anthropologist since 2003, including working for two years under Dr. Steve Sims, the most respected

anthropologist in terms of toolmark analysis, at the Shelby County Medical Examiner's Office in Memphis, Tennessee.

After testifying on her qualifications, Dr. Love explained that forensic anthropology is the application of physical anthropology, which is the study of the human skeleton, to medical-legal cases. Dr. Love also explained that a toolmark is a mark left on bone by an instrument such as a saw or a knife. Dr. Love explained that "toolmark analysis is a morphological study. It is not a test study such as you have with chemistry or DNA.... [I]t is a descriptive analysis." In addition, Dr. Love explained that it is possible to differentiate between human bones and animal bones. Dr. Love testified that it is easy to tell the difference when one examines a complete bone, however it becomes more difficult when dealing with bone fragments. When examining bone fragments, one looks for features such as the thickness of the cortical bone or the pattern of the sponginess in trabecular bones to determine whether the fragment is more likely a human or non-human bone. During her testimony, Dr. Love discussed the differences between antemortem trauma to bones versus perimortem trauma. Dr. Love went on to describe the effect burning has on bones and the differences between blunt force trauma to bones and thermal trauma to bones.

Dr. Love then testified about specific bone fragment exhibits in this case, which consisted of photographs of the fragments. Dr. Love opined that the fragments had been cut with some type of saw at or near the time of death and then they had been burned. While Dr. Love could not testify to a reasonable degree of scientific certainty that the bone fragments were human, she did testify the fragments had characteristics that were consistent with being from a human forearm bone.

At the close of the evidence, the case was submitted to the jury, which found [Shepherd] guilty. The case then proceeded to the punishment phase where [Shepherd] testified.

During his testimony, [Shepherd] admitted he got into an argument with Stewart over her dating Mark and that he strangled her to death. [Shepherd] then testified that he panicked and "decided that [he] needed to cover up [his] tracks." Initially, [Shepherd] testified that he went to a nearby hardware store where he bought an electric jigsaw. [Shepherd] then explained he placed Stewart's body in his apartment's bathtub and then dismembered her body using the jigsaw. Using a pair of pliers, [Shepherd] pulled out all of Stewart's teeth, which he then burned in his smoker grill on his patio along with some of Stewart's body parts. [Shepherd] placed the remaining body parts in a plastic box, which he slid down the

stairs, loaded in his car, and eventually threw in an apartment dumpster. After he disposed of Stewart's body, [Shepherd] proceeded to burn the clothes and shoes he had been wearing, as well as Stewart's clothing.

*Shepherd v. State*, No. 14-08-00970-CR, 2011 WL 166893, at *1–5 (Tex. App. Jan. 11, 2011)(footnotes omitted).

The Court of Appeals affirmed Shepherd's conviction and sentence. Shepherd filed a petition for discretionary review, which the Texas Court of Criminal Appeals ("TCCA") refused on August 24, 2011. *Shepherd v. State*, PDR No. 200-11 (Tex. Crim/. App. 2011). Shepherd did not file a petition for a writ of *certiorari* in the Supreme Court of the United States.

Shepherd next filed an application for a writ of habeas corpus in state court. The TCCA denied this application without written order on the findings of the trial court. SH-02 at cover.[1] He filed a federal petition on November 27, 2017 and amended his petition on December 12, 2017. Respondent moved for summary judgment on March 19, 2018, and Shepherd responded to the motion on April 18, 2018.

## II.    The Applicable Legal Standards

### A.    The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28

---

[1]      "SH" refers to the record of Shepherd's state habeas corpus proceedings.

U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999). For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd,* 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104

(2003).  The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'"  *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

### B.    The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by

28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981). In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

III.    **Analysis**

A.    **Denial of Motion to Suppress**

Shepherd was arrested after telling Quanell X, in the presence of a police officer, that he put Tynesha Stewart in a dumpster. Shepherd contends that he requested counsel several times after his arrest, but that an Assistant District Attorney, Kelly Siegler, told his attorney, Stanley Schneider, that Schneider could not represent Shepherd because Schneider also represented Quanell X, a potential witness in the trial of this case. Siegler threatened to file a grievance against Schneider if he persisted in representing Shepherd. Schneider met briefly with Shepherd to inform Shepherd that he could not serve as counsel.

Following this meeting with Schneider, Shepherd gave a videotaped confession. The police officer who took the statement testified that Shepherd made an unsolicited offer to give a statement and was read his rights before making the statement. 4 RR at 86-90.

The police used Shepherd's statement to obtain a search warrant for Shepherd's apartment. During a search pursuant to that warrant, the police seized bone fragments and enamel from the garbage disposal. Shepherd's confession was not entered into evidence, but an expert witness testified that DNA taken from the bone fragments and enamel were consistent with Stewart's DNA.

Respondent argues that this claim is procedurally defaulted because Shepherd did not present it to the TCCA in his petition for discretionary review following his direct appeal.

Shepherd responds that he did not raise this claim in his direct appeal at all but did raise it in his state habeas application. Because he did not raise the claim on direct appeal, he argues that the state habeas court's dismissal of the claim as raised and rejected on appeal was incorrect, and that the claim is not procedurally defaulted.

Shepherd cites *Hodges v. Epps*, 648 F.3d 283 (5th Cir. 2011) for the proposition that a state court declining to review a claim on the grounds that it has already done so is not a bar to federal habeas review. In *Hodges*, however, the Mississippi Supreme Court reviewed the claim on direct appeal before the petitioner raised it in his state habeas petition. Thus, the claim was presented to the state's highest court. In this case, respondent argues that, by failing to raise this claim in his petition for discretionary review, Shepherd failed to present it to the TCCA. Because state procedural law does not allow for state habeas review of a claim that was adjudicated on the merits on direct appeal, Shepherd's failure to raise the claim in a petition for discretionary review means that the claim was never presented to the TCCA. The default argument is not based on the claim that the state habeas court refused to review the claim on *res judicata* grounds, as in *Hodges*, but that Shepherd presented the claim to the Court of Appeals, but failed to present the claim to the TCCA in his petition for discretionary review of his direct appeal. Under Texas law, the claim could not be reconsidered on habeas review, and thus could not be presented to the TCCA, because it was decided on direct appeal. The issue is not *res judicata*, but Shepherd's failure to raise the claim at the appropriate time. *Hodges* does not support Shepherd's argument that the claim is not procedurally defaulted.

Shepherd next argues that the claim raised here is not the same claim rejected on direct appeal, and that the state habeas court was therefore incorrect in rejecting this claim as decided on appeal. He argues that the appellate court rejected the claim solely on the grounds that

Shepherd initiated conversation with the police leading to his confession, information from which was used to obtain a search warrant for Shepherd's apartment. He contends that, in his state habeas application, he argued that the Constitution requires a separate finding that his initiation of contact with the police was itself the result of a knowing and voluntary waiver of his right to counsel.

Shepherd's description of the state appellate court's reasoning is too narrow. The Court of Appeals noted that Shepherd

> told Sergeant Miller he wanted to give his statement without an attorney because he wanted to tell the truth. Appellant was then read his Miranda warnings a second time and represented he was not coerced or forced to give a statement. Appellant then gave his videotaped confession. Information from that confession was then used on the affidavit supporting the Sheriff Department's application for a search warrant for appellant's apartment. Numerous items of evidence were then seized from appellant's apartment using that search warrant.

*Shepherd v. State*, No. 14-08-00970-CR, 2011 WL 166893, at *18 (Tex. App. Jan. 11, 2011). In discussing the standard of review, the court noted that

> A criminal suspect is deemed to have waived his previously-invoked right to counsel only when (1) the suspect himself initiates further communication with the police, and (2) after he re-initiates communication with the police, the suspect validly waives his right to counsel. *Id.* at 527.

*Id.*, at *19. The court concluded:

> Here, the record demonstrates that Sergeant Miller ceased interviewing [Shepherd] once he invoked his right to counsel. The record further establishes that [Shepherd] was not approached again by the police until Sergeant Miller began administrative booking procedures. Approaching [Shepherd] to carry out administrative booking procedures did not violate the *Edwards* [*v. Arizona,* 451 U.S. 477, 484-85 (1981)] rule because these procedures are not considered custodial interrogations because they do not normally elicit incriminating responses. *See* [*Cross v. State*, 144 S.W.3d 521,] 524–25 n. 5 [(Tex. Crim. App. 2004)].

> The record further demonstrates that during this process, [Shepherd] asked Sergeant Miller if he wanted his statement. When Sergeant Miller asked [Shepherd] what he meant, [Shepherd] said "I want to give you a statement." After Sergeant Miller explained that because [Shepherd] had invoked his right to an attorney, he could not ask him any more questions without an attorney present, [Shepherd] replied: "I wanted to give you a statement without an attorney because I want to tell you the truth. I'll tell you my side of the story." Finally, the record establishes that before starting his interview of [Shepherd], Sergeant Miller again read [Shepherd] his rights; asked [Shepherd] if he wished to waive those rights; and [Shepherd] replied that he did. We conclude that the requirements of *Edwards* were met and that [Shepherd]'s confession was not obtained in violation of his constitutional and statutory right to counsel. Since [Shepherd]'s confession was not obtained in violation of his right to counsel, the probable cause affidavit supporting the search warrant for [Shepherd]'s apartment was not tainted and the trial court did not abuse its discretion when it denied [Shepherd]'s motion to suppress.

*Id.* The Court of Appeals thus makes very clear that it found not only that Shepherd initiated the contact with the police, but that he was re-advised of his right to counsel and voluntarily waived that right. This is the claim Shepherd raised in state habeas. Therefore, the state habeas court's conclusion that Shepherd's habeas claim was raised and rejected on appeal was correct. Because Shepherd did not present this claim to the TCCA in his petition for discretionary review, he did not present it to Texas' highest court in the manner required by Texas law, and the claim is procedurally defaulted.

Even if Shepherd did not raise this precise claim on direct appeal, the state habeas court found, in the alternative, that the claim was procedurally defaulted because Shepherd could have raised it on direct appeal. SH (Doc. # 9-50), at 263-64. Under Texas law, a habeas application is not a substitute for an appeal. *Ex Parte Banks*, 769 S.W.2d 539 (Tex. Crim. App. 1989); *Ex Parte Clore*, 690 S.W.2d 899 (Tex. Crim. App. 1985). The claim is thus procedurally defaulted on this alternate ground if, in fact, Shepherd did not raise it on direct appeal.

"When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). The Supreme Court has noted that

> [i]n all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750-51), *cert. denied*, 523 U.S. 1125 (1998); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism"). Shepherd does not argue that cause exists for his procedural default. Therefore, this claim is procedurally defaulted, and this Court cannot grant relief.

### B.      Ineffective Assistance of Appellate Counsel

In his next three claims for relief, Shepherd contends that his appellate counsel rendered ineffective assistance by failing to challenge: 1) Shepherd's warrantless arrest, and the admission of evidence obtained pursuant to that arrest; 2) the admission of testimony suggesting that Shepherd dismembered the victim's body; and 3) the admission of evidence that Shepherd threatened and abused the victim.

A defendant is constitutionally entitled to effective assistance of appellate counsel when he has a right to appeal under State law. *Evitts v. Lucy*, 469 U.S. 387, 395 (1985). To prevail on a claim for ineffective assistance of appellate counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the [appeal]. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair [appeal], a[n appeal] whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Duhamel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992). In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances. *Id.* at 688. Review of counsel's performance is deferential. *Id.* at 689. In assessing prejudice, "*Strickland* asks whether it is reasonably likely the result would have been different," if not for counsel's deficient performance. *Harrington v. Richter*, 562 U.S. 86, 111 (2011)(internal quotation marks omitted).

Appellate counsel is not required to raise every possible non-frivolous claim on appeal. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). However, "a reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. . . . Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999).

1.      Warrantless Arrest

As discussed above, Houston homicide detective Sergeant Miller accompanied Shepherd and Quanell X to an apartment complex.

> Once inside that complex, they travelled to the back toward a trash dumpster. The three men exited the car and walked up to the dumpster where Quanell X asked [Shepherd]: "Tim, is this where you put her?" [Shepherd] answered "[y]es." Sergeant Miller then placed [Shepherd] under arrest.

*Shepherd v. State*, No. 14-08-00970-CR, 2011 WL 166893, at *3 (Tex. App. Jan. 11, 2011). Shepherd now contends that this warrantless arrest violated Texas law, and that his appellate counsel was ineffective for failing to challenge the arrest and the admission of any evidence obtained as a result of the arrest.

Under Texas law, a warrant is required for an arrest unless a statutorily enumerated exception applies. TEX. CODE CRIM. PROC. Art. 14.03. Shepherd moved to suppress the evidence obtained as a result of his arrest, and the trial court denied the motion. The trial court found that the warrantless arrest was valid under Texas law pursuant to three separate exceptions to the warrant requirement: that the arresting officer had probable cause to believe that Shepherd committed a murder; that the arresting officer had probable cause to believe that Shepherd committed an act of family violence; and that Shepherd was in a suspicious place, *i.e.*, near the apartment complex dumpster, when he was arrested. *See* Supp. CR[2] (Doc. # 6-10).

Shepherd's appellate counsel, Keisha Smith, submitted an affidavit in connection with Shepherd's state habeas proceeding. Smith stated that she considered raising a claim challenging the admission of evidence obtained pursuant to the warrantless arrest but, after reviewing the

---

[2]      "CR" refers to the Clerk's Record.

record and the law, concluded that it was not a meritorious claim.  SHCR-02[3] (Doc. # 9-49), at 238-39.  The state habeas court found the affidavit credible, and that counsel did not render deficient performance.  SHCR (Doc. # 9-47), at 262-64.

At a minimum, and contrary to Shepherd's argument, it is beyond serious dispute that the arresting officer had probable cause to believe that Shepherd committed a serious felony. Shepherd stated, in hearing of the officer, that he deposited the victim's body in the dumpster. Shepherd now argues that he never stated that he harmed Tynesha and notes that the body was not found in the dumpster.  Neither argument is convincing.

First, the mere assertion that he deposited the victim in the dumpster is sufficient for any reasonable person to conclude that he harmed her.  Indeed, the officer testified at the suppression hearing that, in his experience, people don't "put bodies that are perfectly fine in dumpsters."  4 RR at 123. Second, the fact that the body was not found in the dumpster was not known to the officer at the time of the arrest and has no bearing on whether probable cause existed at that time.

In light of the record, appellate counsel's decision not to raise this claim was well within the bounds of reasonable professional judgment.  Therefore, counsel was not deficient.  *See Strickland*, 466 U.S. at 690.  Moreover, the fact that a state court found that probable cause existed, along with the clear evidentiary support for probable cause, makes it very unlikely that any such claim would have been successful.  Shepherd therefore fails to satisfy either prong of the *Strickland* test , and he is not entitled to relief on this claim.

---

[3]      "SHCR" refers to the State Habeas Clerk's Record.

2. <u>Evidence That Shepherd Dismembered the Body</u>

Shepherd next contends that appellate counsel was ineffective by failing to challenge testimony, which Shepherd characterizes as hearsay, that Shepherd dismembered the victim's body. Deputy Gary Clayton testified about a search of Shepherd's apartment. The allegedly objectionable testimony is as follows:

> Q:  When you went back [to the apartment] on March the 26th of 2007, were you armed with additional information?
>
> A:  Yes, ma'am. At that time we believed that the Complainant has been dismembered or possibly burned. So, we were looking for more specific evidence at that time.

10 RR at 200. Shepherd objected to the testimony, and the objection was overruled.

Under Texas law, hearsay is defined as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Tex. R. Evid. 801.

While this testimony almost certainly references an out of court statement, *i.e.*, the source of the witness' belief that the body was dismembered or burned, it is not offered for the truth of the statement. Viewed in context, the statement explains what the police were looking for and why they conducted the search. The witness clearly states that police "*believed* that the Complainant has been dismembered or possibly burned" (emphasis added), not that she had, in fact, been dismembered or burned. Moreover, the statement that they were seeking evidence on this matter makes clear that the police did not know if the victim had been dismembered or burned.

A Texas appellate court will overrule a trial court's evidentiary ruling only when the ruling is an abuse of discretion. *Rivera v. State*, 808 S.W.2d 80, 96 (Tex. Crim. App. 1991). "A

trial court abuses its discretion when it acts outside the zone of reasonable disagreement." *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007).

While Shepherd may have a good faith argument that the statement was hearsay, the trial court's conclusion to the contrary was not outside the zone of reasonable disagreement. Because the trial court's ruling was not an abuse of discretion, it is unlikely that a challenge to this ruling would have been successful on appeal. Therefore, appellate counsel was not deficient by failing to raise the claim, and Shepherd cannot demonstrate *Strickland* prejudice.

### 3. Evidence of Threats and Abuse

In his final claim for relief, Shepherd argues that appellate counsel was ineffective by failing to challenge the admission of hearsay testimony suggesting that he was physically abusive to the victim before he killed her. Gayla Stewart Taylor, Tynesha Stewart's older sister, testified that Tynesha told her that Shepherd put his hands around her neck and threatened to kill her. 8 RR at 226. Respondent concedes that this was hearsay but argues that it falls under the excited utterance exception to the hearsay rule. *See* Tex. R. Evid. 803(2)(defining "excited utterance" as "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.").

Before Taylor related the statement, the prosecutor asked her about the circumstances leading up to the statement. She testified that Tynesha called her on the phone and was "hysterical" and crying. She testified that this was unusual, as Tynesha was normally very calm. They met a short time later, and Tynesha was still in the same emotional state. The witness described her as "crying, hysterical, and . . . rocking like it was something that was really bothering her that was really wrong." 8 RR at 221-23. Defense counsel took the witness on *voir*

*dire* and established that she could not tell how much time elapsed between the event and the statement. *Id.* at 224-25. Counsel objected on hearsay grounds, and the objection was overruled.

Shepherd now argues that the trial court erred because the witness did not establish any time frame for the underlying event. The Texas Court of Criminal Appeals has explained, however, that

> it is not dispositive that the statement . . . was separated by a period of time from the startling event; [this is] simply [a] factor[] to consider in determining whether the statement is admissible under the excited utterance hearsay exception. *See Lawton v. State,* 913 S.W.2d 542, 553 (Tex.Crim.App.1995); *Penry v. State,* 903 S.W.2d 715, 750–51 (Tex.Crim.App.1995); *McFarland v. State*, 845 S.W.2d 824, 846 (Tex.Crim.App.1992).

*Zuliani v. State*, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003).

Shepherd argues that the absence of testimony setting any temporal framework for the statement renders it impossible for the court to have determined that it was made under the influence of the underlying event. He acknowledges, however, that the case law holds that an excited utterance can be made days after an event, as long as the statement is made under the influence of the event. As the TCCA explained:

> The basis for the excited utterance exception is "a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for *reflection* necessary to the fabrication of a falsehood and the 'truth will come out.' " *Evans v. State,* 480 S.W.2d 387, 389 (Tex.Crim.App.1972) (emphasis added). In other words, the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event. *Ibid.; Ricondo v. State,* 475 S.W.2d 793, 796 (Tex.Crim.App.1971).

*Zuliani*, 97 S.W.3d at 595.

The witness' testimony set out a context for the statement that allowed the trial court to conclude that it was made under the stress of the underlying event. Because Texas law places no particular temporal limitations on an excited utterance, and considering the deferential standard of review that a Texas appellate court gives to trial court evidentiary rulings, Shepherd's argument is unlikely to have succeeded on appeal. It was therefore within appellate counsel's reasonable professional judgment to omit this claim on appeal, and Shepherd suffered no prejudice from that decision. Appellate counsel was not ineffective, and Shepherd is not entitled to relief.

### C. <u>Conclusion</u>

For the foregoing reasons, respondent's motion for summary judgment is granted, and Shepherd's amended petition is denied and is dismissed with prejudice.

## III. <u>Certificate of Appealability</u>

Shepherd has not requested a certificate of appealability ("COA"), but this Court may determine whether she is entitled to this relief in light of the foregoing rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253© is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court has carefully considered Shepherd's amended petition and concludes that he fails to make a substantial showing of the denial of a constitutional right. The Court concludes that jurists of reason would not find this Court's ruling debatable. Therefore, Shepherd is not entitled to a certificate of appealability.

**IV.    Order**

For the foregoing reasons, it is ORDERED as follows:

A.    Respondent Lorie Davis' motion for summary judgment (Doc. # 10) is GRANTED;

B.    Petitioner Timothy Wayne Shepherd's amended petition for a writ of habeas corpus (Doc. # 2) is DISMISSED WITH PREJUDICE; and

C.    No certificate of appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum and Order.

It is so ORDERED.

SIGNED on this 21st day of December, 2018.

Kenneth M. Hoyt
United States District Judge